# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**MARY-ELIZABETH HARPER,**

    Plaintiff,

    v.

**UNIVERSITY OF TOLEDO,**

    Defendant.

CASE NO. 3:22 CV 1308

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending before the Court in this employment discrimination case is Defendant the University of Toledo's Motion for Summary Judgment (Doc. 58), to which Plaintiff, Mary-Elizabeth Harper, has filed an Opposition (Doc. 61), and Defendant has Replied (Doc. 65). Plaintiff also filed a Motion for Leave to File a Sur-Reply (Doc. 68), which Defendant opposes (Doc. 73), and to which Plaintiff replied (Doc. 74). Also pending are multiple fully-briefed related motions regarding the evidence to be considered relative to the summary judgment motion. *See* Doc. 59 (Motion for Judicial Notice); Doc. 66 (Motion to Strike Portions of the Affidavit of Dreyon Wynn); Doc. 67 (Motion to Strike Ohio Civil Rights Commission Letters of Determination and Sections of Plaintiff's Opposition Relying on Improper Evidence). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons stated below, the Court finds Defendant is entitled to summary judgment.

## BACKGROUND

This case arises out of Plaintiff's 2020 application for employment as a Senior Labor Relations Specialist with Defendant. *See* Doc. 33. Plaintiff, who is an African American woman,

applied for one of two open Senior Labor Relations Specialist positions with Defendant in September 2020. *Id.* at ¶ 2, 13. At the time of her application, Plaintiff lived in Oregon, but wanted to move to the Midwest to be closer to family. (Plaintiff Aff., at ¶ 4).

Plaintiff submitted a resume with her application and agreed to a "Disclaimer" included in the application which stated:

> I certify that the statements contained in my application, resume, and other information that I have submitted are true and without omission. I understand that any misstatement or omission of fact in my application or in the interview process may lead to a withdrawal of an offer of employment, or discipline up to and including termination of employment. I understand that if this application is not completed in its entirety, signed, dated, and submitted with all information requested in the job posting, it will not be processed and I will not be considered for employment. I understand that an offer of employment may be conditioned upon successful completion of medical examination(s), including successfully passing a drug test. I understand that preemployment background, education, and credential inquiries are also conducted by The University of Toledo. I authorize the University of Toledo to investigate information supplied by me and to inquire further in regard to my background including academic and occupational records in its consideration of me as a prospective employee.
>
> I verify that the information I have or will provide to the University of Toledo as part of my application for employment is true and that I have read and understand the above paragraph.

(Plaintiff Depo., Ex. 1, Doc. 52, at 185); Plaintiff Depo., at 104-07.[1] Plaintiff testified she expected Defendant to rely upon the information in her resume. (Plaintiff Depo., at 63, 87). Plaintiff's resume reflected that she had served as "general counsel" and had "[s]erved as 1st and 2nd chair with head counsel in court proceedings" as a "litigation associate". (Ex. 1, Plaintiff Depo., Doc. 52, at 180). Plaintiff testified she took and passed the bar exam and obtained a license to practice law in Michigan. (Plaintiff Depo., at 24, 28, 85-87). However, in her

---

1. Plaintiff's deposition is located at ECF Doc. 52.

opposition brief, Plaintiff states that she "did attend and graduate from law school but did not pass the one bar exam she took." (Doc. 61, at 17).

Plaintiff interviewed with a search committee and subsequently with John Elliott, Senior Associate Vice President and Chief Human Resources Officer. (Plaintiff Aff., Doc. 60-1, at ¶ 5).

Defendant, through Dreyon Wynn, verbally offered Plaintiff the job on December 9, 2020 with a January 25, 2021 start date; Plaintiff accepted. (Fahey Depo., at 24; Plaintiff Aff., at ¶ 6).[2] Wynn was the Director of Labor/Employee Relations and HR Compliance at the time. (Wynn Aff. at ¶2).[3] Defendant offered the other open position to Susan Bungard, a Caucasian woman.[4] (Ziviski Depo., at 27).[5] Wynn avers that the search committee, of which he was part, "thoroughly reviewed [Plaintiff's] application and resume" and that at the time Defendant offered Plaintiff the job, Wynn "was aware that, although Harper had attended and graduated from law school, she was not admitted to practice law." (Wynn Aff., Doc. 60-2, at ¶¶ 5, 7).

Two days later, Kimberly Fahey, a Human Resources Specialist with Defendant emailed Plaintiff regarding various pre-employment requirements. (Ex. 5, Fahey Depo., Doc. 55, at 107-08). The email states: "Congratulations on your offer of employment . . .! **Your offer is contingent upon completion of the background check and pre-hiring requirements.** We ask that you complete the following pre-hire requirements to move forward with the hiring process." *Id.* at 107 (emphasis in original). The listed requirements included a background check, personal information form, I-9 form, a certified copy of college transcripts, and a drug screening. *Id.* at 107-09. Each of these is labeled "**Pre-Hire Requirement**". *Id.* (emphasis in original).

---

2. Kimberly Fahey's deposition transcript is located at ECF Doc. 55.
3. Wynn's Affidavit is located at ECF Doc. 60-2.
4. Bungard accepted the position, but withdrew her acceptance in January 2021. (Ziviski Depo., at 27).
5. Bethany Ziviski's Deposition is located at ECF Doc. 56.

Defendant sent Plaintiff her official offer letter on December 14, 2020. (Plaintiff Depo., Ex. 13, Doc. 52, at 273). The letter was signed by John Elliott and it reiterated a January 25, 2021 start date. *Id.* The offer stated it was "contingent upon the following:"

1. Approval by the Board of Trustees.

2. Receipt of your official university transcripts verifying your college degree(s) in a sealed envelope mailed from the college directly . . .

3. Verification of licensure/certificate/credential(s), if required for the position.

4. Successful completion of background checks.

5. Completion of employment documents, required by law or University policy.

6. Verification of identity and eligibility to be employed in the United States, as required by federal law.

7. Successful completion of drug testing, cotinine testing and employee health screening. Please contact Family Medicine . . . to schedule an appointment.

*Id.* The letter instructed Plaintiff to contact Fahey with questions, and stated: "[t]o accept this conditional offer of employment, please electronically sign this letter." *Id.* Plaintiff testified she received the letter and did not electronically sign the letter. (Plaintiff Depo., at 112-13). Plaintiff avers that she was not given a deadline by which she needed to complete the onboarding paperwork. (Plaintiff Aff., Doc. 60-1, at ¶ 9). Plaintiff further acknowledged that she was in receipt of emails from Defendant regarding onboarding. (Plaintiff Depo., at 125); (Ex. 14, Plaintiff Depo., Doc. 52, at 275).

Elliott was questioned about whether Plaintiff was qualified for the job, and responded as follows:

Q: And Mary Harper was qualified for the position of senior labor relations specialist which University of Toledo was looking to fill in the fall of 2020, correct?

A: Yes.

4

* * *

Q: And you offered this position to Ms. Harper because she was qualified for the position of senior labor relations specialist?

A: Yes.

* * *

Q: Mary Harper was qualified for the position of senior labor relations specialist which you offered her on December 14, 2020, correct?

A: Correct.

(Elliott Depo., at 16, 19, 117).[6] On December 17, 2020, Plaintiff emailed Fahey stating:

I am in receipt of several emails from your office regarding Onboarding for the Senior Labor Relations Specialist position with the University of Toledo. I also received your voice message today. I apologize for my delay in responding.

Unfortunately, I have been involved with providing extensive care for an older brother in Illinois who is gravely ill. I would like to call you tomorrow (Friday 12/18/20) to review the processes I need to effectuate my Onboarding.

Thank you for your phone call. I look forward to talking with you tomorrow.

(Ex. 5, Fahey Depo., Doc. 55, at 106). Plaintiff and Fahey spoke the following day; during the call Fahey told Plaintiff she needed to submit her degree transcripts, and that she would receive emails from IntelliCorp and Cornerstone related to her onboarding. (Fahey Depo., at 18).

Plaintiff emailed Fahey on January 4, 2021, stating "Please find attached onboarding documents. I will call you tomorrow to clarify some things." (Ex. 14, Fahey Depo., Doc. 55, at 133). Fahey and Plaintiff spoke again on January 4 or 5, 2021. (Fahey Depo., at 19-20).

There is no record of communication between Plaintiff and anyone affiliated with Defendant between January 5 and January 20. As of January 20, 2021, the remaining outstanding onboarding requirements remained incomplete. *See* Doc. 33, at ¶ 26 ("As of January 20, 2021, a

---

6. John Elliott's deposition transcript is located at ECF Doc. 54.

few items of the Plaintiff's paperwork, including her higher education transcripts, still needed to be sent to the University.").

On January 20, 2024, at 9:20 a.m., Fahey emailed Bethany Ziviski, Executive Director, Labor and Employment Relations, and Wynn with the subject line: "Mary Harper":

> I am reaching out to let you know that Mary is missing many onboarding items. I have left a message. I know that she was dealing with family health issues so maybe that is why she has not completed the background, I-9, personal information, provided degree transcripts or signed her offer letter. I will let you know after she calls me back what the status of the conversation will be. If you have any information that Mary has reached out to you to change her start date, please let me know.

(Ex. 6, Fahey Depo., Doc. 55, at 111-12). At 10:52 a.m., Ziviski responded, stating: "Please send a letter to Mary notifying her that we are withdrawing the offer. If you have any questions, please let me know." *Id.* at 111. Fahey responded three minutes later, stating: "Thank you, we will put together a letter for John to sign." *Id.* At 11:34 a.m., Fahey emailed Plaintiff, notifying her that the offer was being rescinded, and attaching a letter from John Elliott. *Id.* at 113-14. The letter said the decision was based on Plaintiff's "failure to complete the pre-employment requirements in a timely manner." *Id.*

Ziviski's Communications With Powell

Ziviski was offered the job of Executive Director, Labor and Employment Relations, at Defendant on November 20, 2020, and started her employment on January 11, 2021. (Ziviski Depo., at 6-7). Ziviski and Dan Powell (who are both Caucasian) had previously worked for Defendant; Powell had worked as a Senior Labor and Employee Relations and Compliance Specialist until September 2020 when he left to work at Bowling Green University as the Equity and Compliance Officer. (Powell Depo., at 6-9).[7] Between the time Ziviski was offered the job

---

7. Dan Powell's deposition transcript is located at ECF Doc. 53.

and when she began in January 2021, she communicated with Powell about returning to work for Defendant. *Id.* at 34-35; (Powell Depo., Ex. 9, Doc. 53, at 112-222) (text messages). Specifically, Plaintiff highlights the following messages Ziviski sent Powell: "I REALLY want us to work together again at UT."; "We just need to figure out the best possible position for you."; and "At this point as long as you haven't killed anyone we should be good." (Ex. 9, Powell Depo., Doc. 53, at 133); (Ziviski Depo., at 66-67) (text messages between December 1, 2020 and February 1, 2021). Further, Plaintiff highlights the following exchange in early December between Ziviski and Powell:

| Powell: | Make sure Dre doesn't put in an email that this is Toth's fault, like he did with Newton . . . or maybe you want him to . . . [] |
| Ziviski: | [] I won't tell him not too [sic] if you don't.<br>That's not true…I will try to help him. |
| Powell: | Just remember he plays dirty. |
| Ziviski: | They all do. |
| Powell: | Truth. |
| Ziviski: | I expect to be sued in the New Year. It's going to be one of my resolutions. |
| Powell: | Lol. I'll be a character witness for you. [] |
| Ziviski: | Thanks. I might need you to! |
| Powell: | You might! |
| Ziviski: | I will also practice my innocent look. |
| Powell: | Lol… |
| Ziviski: | WD and I can have our depositions on the same day. Maybe we can hang out together. |
| Powell: | Lol. Besties!! |

(Ex. 9, Powell Depo., Doc. 53, at 159-60). Ziviski testified that by "They all do", she was referring to "the labor relations world", not African Americans, and "some of the people we had dealt with at the University of Toledo prior to 2019, in large part, folks who were not there anymore." (Ziviski Depo., at 74-75). She further testified that she was joking about being sued and practicing her innocent look because litigation was common in her job based on the decisions they made regarding hiring and firing. *Id.* at 75-80; *Id.* at 75 ("We always talked about getting sued or - - it's a difficult position working in the public sector; so it's something we talked about."); *Id.* at 79 ("We were just joking around about - - things that can be very difficult in our line of work are things that we joke about, because that's how we get through it.").

Elliott testified that by December 2020 (after Ziviski's hiring, but prior to her start date), he was aware that Ziviski wanted Powell to return to work with her. (Elliott Depo., at 24-25).

<u>Senior Labor and Employee Relations and Compliance Specialist Position Posted</u>

On January 21, 2021 (the day after Plaintiff's offer was rescinded), Fahey emailed Ziviski about a "Sr Labor Relations posting". (Ex. 8, Fahey Depo., Doc. 55, at 115). The email stated:

> The req that posted was only for the Sr Labor Relations Specialist, as they were going to hire 2 for this position. I have included the [job description] that we use and then the Sr Labor Employee Relations and Compliance Specialist. Talking with Jason, he let me know that you wanted to post the Sr Labor Employee Relations and Compliance Specialist[.] [I]f this is the case can you review the job descriptions and let me know if there is [sic] any changes to the [job description] that you would like to make before I post this.

*Id.* Ziviski forwarded this email to Elliott, stating "My thought is that we post the Sr Labor and Employee Relations and Compliance Specialist position. This is Dan's previous position and has the crossover with Title VII. Do you agree?" *Id.* Elliott responded, "Yes." *Id.*

8

Defendant posted the position for Senior Labor and Employee Relations and Compliance Specialist on January 21. (Fahey Depo., at 55). This position was very similar to the Senior Labor Relations Specialist position for which Plaintiff had applied; it differed in that the new position included EEOC and OCRC institutional compliance duties. (Elliott Depo., at 79); *Compare* Ex. 15, Elliott Depo., Doc. 54, at 191-94 (Senior Labor Relations Specialist Job Description) *with* Ex. 16, Elliott Depo., Doc. 54, at 195-9 (Senior Labor and Employee Relations and Compliance Specialist position description). Plaintiff did not apply for this (or any other) position with Defendant. (Plaintiff Depo., at 97).

Three days after Defendant posted the position, on January 24, Ziviski asked Fahey whether there had been any applicants for the position. *Id.* at 56; (Ex. 9, Fahey Depo., Doc. 55, at 118). Fahey responded the next day (January 25) that there were four applicants and that she had "moved them in review status to see". (Ex. 9, Fahey Depo., at 118). Ziviski forwarded this email to Elliott, and said: "Dan Powell applied to the labor position. Can I have Kimberly get an offer letter ready for him for $90,000?" (Ex. 5, Ziviski Depo., Doc. 56, at 127). Elliott responded, "First, ask her how long it needs to be posted. I think it's 5 days but yes, once it's met the posting requirements please proceed." *Id.* Ziviski then replied to Fahey's earlier email, asking: "How long does this position need to be posted?" (Ex. 9, Fahey Depo., at 118). Fahey told her "[u]sually a week but you can start interviewing if your committee is ready. Just let me know what date to close the posting on as right now it is open until filled." *Id.* at 117. Ziviski responded approximately 45 minutes later with: "Please make an offer to Dan Powell. His salary will be $90,000 annually." *Id.* On January 25, 2021, Elliott approved Powell's offer letter for the Senior Labor & Employee Relations and Compliance Specialist position. (Ex. 6, Ziviski Depo., Doc. 56, at 129). Powell accepted on January 30. (Ex. 7, Ziviski Depo., at 130).

Powell never actually went back to work for Defendant. On February 4, 2021, he withdrew his acceptance of the Senior Labor and Employee Relations and Compliance Specialist position. (Powell Depo., at 32). Powell testified he did so because his current employer increased his salary. *Id.* at 32-33. On February 5, 2021, Defendant posted an opening for the position of "Director of Labor/Employee Relations." (Ziviski Depo., at 89). Powell applied for this position (Plaintiff did not); Powell ultimately withdrew his name from consideration for the Director position. (Powell Depo., at 74, 79).

The Senior Labor Relations Specialist positions that had been offered to Plaintiff and Bungard were never filled. (Ziviski Depo., at 62); (Fahey Depo., at 53). At some point in time, Defendant's Human Resources Department was restructured. (Ziviski Depo., at 62).

OCRC Investigation and Determination

On March 1, 2021, Plaintiff filed a charge of discrimination based on age, race, sex, and disability, with the Ohio Civil Rights Commission ("OCRC"). (Doc. 60-1, at 4-6). The OCRC conducted an investigation and on November 18, 2021 issued a letter of determination finding "probable cause" that Defendant discriminated against Plaintiff based on race, sex, and age. *Id.* at 7-11.

**STANDARD OF REVIEW**

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case

contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

### DISCUSSION

Defendant contends it is entitled to summary judgment on Plaintiff's race and gender employment discrimination claims. Specifically, Defendant asserts Plaintiff cannot establish a *prima facie* case of discrimination because (1) she was not qualified for the position due to her failure to complete the pre-employment requirements and her misrepresentations in her application; (2) she did not suffer an adverse action when Defendant withdrew a contingent offer of employment; and (3) she was not replaced by someone outside her protected class or treated less favorably than anyone outside her protected class. Moreover, Defendant asserts it has provided a legitimate, non-discriminatory reason for its action, and Plaintiff cannot show pretext. Plaintiff, for her part, contends she can establish a *prima facie* case and can create an issue of fact as to pretext.

<u>Preliminary Motions / Evidentiary Issues</u>

Before turning to the substance of the arguments in favor of and against summary judgment, the Court pauses to address the myriad motions filed and issues raised in conjunction with and ancillary to the main briefing. *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motions."). Because these motions address the arguments and evidence that are properly before the Court for consideration in the summary judgment motion, the Court addresses them first.

### *Consideration of Plaintiff's Deposition*

In her opposition brief, Plaintiff contends Defendant's reliance on the transcript of her deposition "is objectionable . . . pursuant to Fed. R. Civ. P. 56(c)(2) as the transcript is not in a form that is admissible in evidence." (Doc. 61, at 23). She contends the deposition transcript does not contain the certification required by Federal Civil Rule 30(e)(2). *Id.* at 23-24. She further contends that it would have been "impossible" for the Court Reporter to make such a certification because her deposition was never completed/concluded, but was left open. *Id.* at 24 n.3. Rule 30(e) provides:

> (e) Review by the Witness; Changes.
>
> > (1) *Review; Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
> >
> > > (A) to review the transcript or recording; and
> > >
> > > (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

12

>    (2) *Changes Indicated in the Officer's Certificate.* The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

Fed. R. Civ. P. 30(e). Plaintiff is correct that the deposition was left open. (Plaintiff's Depo., at 163). And she is correct that the deposition transcript does not include the certification required by Rule 30(e)(2) regarding whether review was requested. *See id.* at 165. Nevertheless, it is apparent from the record before this Court that Plaintiff was aware the deposition transcript had been ordered; she herself attached correspondence from the Court Reporter so indicating. *See* Doc. 74-1 (April 3 email from Court Reporter); *see also* Fed. R. Civ. P. 30(e)(1) ("On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available . . ."). She provides no evidence she requested review thereof, and most significantly, does not cite any significant substantive errors therein. *See* Doc. 61, at 24 n.1 (alleging "numerous significant errors", but only citing a misspelled name and an instance where the word "employer" should have been "employee"). Moreover, while the cited rule requires a Court Reporter's certification, nothing therein states that failure to comply with these requirements means a deposition cannot be considered. *See Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 565 (6th Cir. 2009); *Coleman v. Miller*, 2010 WL 1408251, at *2 (M.D. Tenn.) ("While Rule 30(e) and (f) provide certain requirements for reviewing and making changes in depositions and for certificates by the Court Reporter, nothing in Rule 30 provides for the 'suppression' of depositions.").

Thus, although Plaintiff is correct that the transcript is not in strict compliance with Rule 30(e)(2), the Court finds Plaintiff has not demonstrated she will suffer any prejudice from the consideration thereof or that the deposition should not be considered.

### *Motion for Leave to File Sur-Reply (Doc. 68)*

Plaintiff filed a Motion for Leave to File Sur-Reply. (Doc. 68). Defendant opposed (Doc. 73) and Plaintiff replied (Doc. 74). Plaintiff argues sur-reply is warranted because Defendant improperly raised the issue of spoliation for the first time in its reply brief. (Doc. 68, at 1). Defendant responds that its arguments are a proper response to Plaintiff's opposition brief arguments wherein she contradicted her prior sworn testimony. (Doc. 73, at 2-3).

Specifically, Defendant asserts Plaintiff contradicted her sworn testimony regarding the contents of emails, and that Plaintiff testified she intentionally deleted those emails in January 2023. *Id.* In Defendant's reply, it argues the Court should sanction Plaintiff by granting summary judgment in its favor or imposing an "adverse inference" based upon Plaintiff's spoliation of evidence. (Doc. 65, at 12). Spoliation – as opposed to arguments concerning the admissibility of evidence or merit of the arguments within Plaintiff's opposition brief – is a new legal argument not properly presented for the first time in a reply brief. *See Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 521 (E.D.N.Y. 2019) ("Finally, Defendant argues, for the first time in its reply brief, that Plaintiff's failure to pay for the storage of the Vehicle and its ensuing loss and destruction presents a 'spoliation issue.' [] Arguments raised for the first time in a reply brief will generally not be considered."); *Olmos* v. *Ryan*, 2021 U.S. Dist. LEXIS 104427, *17 (D. Ariz.) ("For the first time in his Reply, Plaintiff argues Defendants have engaged in spoliation of evidence . . . Accordingly, the undersigned does not consider this argument.").

Defendant raised spoliation and a request for sanctions for the first time in a lengthy footnote in its reply brief. *See* Doc. 65, at 7-8 n.2 The Court declines to consider such an argument and Plaintiff's motion for sur-reply is therefore denied.

***Motion to Strike Portions of Wynn Affidavit (Doc. 66)***

Defendant moves to strike paragraphs 3 and 9 of Wynn's affidavit on the basis that those paragraphs contain hearsay and are not based on personal knowledge. It cites Federal Rule of Civil Procedure 56(e) in support.

To be considered by the Court on a motion for summary judgment, an affidavit must satisfy three formal requirements: (1) it "shall be made on personal knowledge"; (2) it "shall set forth such facts as would be admissible in evidence" at the time of trial; and (3) it "shall show affirmatively that the affiant is competent to testify to the matters stated therewith." Fed. R. Civ. Pro. 56(e).

The two at-issue paragraphs read as follows:

3. On November 25, 2020 John Elliott, who at that time was the University's Chief Human Resources Officer, informed me during a WebEx meeting that Bethany Ziviski wanted to rehire Daniel Powell to work in the University's Human Resources ("HR") Department.
* * *
9. In early December of 2020, Daniel Powell called me. In the phone conversation I had with Mr. Powell, he informed me that Bethany Ziviski had told Powell that she wanted to rehire him to work at the University. Powell also informed me that he would only accept an offer from the University if he received a salary equivalent to that of the former of Director of Employment, Terrie Kovacs, which was $93,000.

(Doc. 60-2, at 1, 2). Plaintiff responds that first, Defendant's Motion to Strike is procedurally improper, and second, that these statements are supported by other deposition testimony. Although Plaintiff argues a motion to strike is not the appropriate mechanism to challenge these statements, she does not provide a response to Defendant's argument that these statements – as offered by Wynn – are not based on personal knowledge and are hearsay. Because the Court agrees with Defendant as to the inadmissibility of such statements as hearsay and lacking

personal knowledge, the Court sustains Defendant's objection and declines to consider paragraphs 3 and 9 of the Wynn affidavit for purposes of ruling on the underlying motion.[8]

### Plaintiff's Motion for Judicial Notice (Doc. 59)

In conjunction with her brief opposing Defendant's Motion for Summary Judgment, Plaintiff filed a motion requesting that the Court take judicial notice of "complaints filed in several other employment discrimination cases filed against [Defendant] in the Northern District of Ohio" along with the Ohio Civil Rights Commission Letters of Determination attached to those complaints as exhibits. (Doc. 59). Specifically, Plaintiff requests the Court take judicial notice of the complaints and attached OCRC letters of determination in *Davis v. University of Toledo*, No. 22 CV 301 (N.D. Ohio); *Kovacs v. University of Toledo*, 22 CV 2151 (N.D. Ohio), and *Chapman v. University of Toledo*, No. 23 CV 102 (N.D. Ohio). Defendant opposes (Doc. 63) and Plaintiff replies (Doc. 64). Defendant then filed a notice of supplemental authority (Doc. 75), and Plaintiff responded (Doc. 76).

Federal Rule of Evidence 201 provides for "judicial notice of an adjudicative fact only, not a legislative fact." It explains that a court may "judicially notice a fact that is not subject to reasonable dispute because it":

---

8. Plaintiff contends a motion to strike is not the appropriate procedural mechanism for asking the Court to decline to consider inadmissible evidence. *See* Doc. 69, at 1 (citing, *inter alia*, *Grief v. Williams*, 2020 WL 5044026, at *2 (N.D. Ohio) ("The Federal Rules of Civil Procedure do not provide for a motion to strike documents or portions of documents other than pleadings. *See* Fed.R.Civ.P. 12(f) (limited to striking pleadings or portions of pleadings). If a brief or affidavit refers to matters a court should not consider at summary judgment (such as inadmissible evidence), while a court is free to exercise its discretion, the usual recourse is for the court simply to disregard those matters, not to strike them.")). Nevertheless, Courts have treated motions to strike as "objections" under Federal Civil Rule 56(c)(2). *See, e.g.*, *Artuso v. Felt*, 2022 WL 17960677, at *6 (N.D. Ohio) ("Instead, in this procedural posture, motions to strike should be construed as objections under Rule 56(c)(2)."); Fed. Civ. R. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). The Court therefore construes Defendant's motion as an objection under Rule 56(c)(2).

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b).

As another judge of this Court explained in a similar case, although the Court can take judicial notice of the fact that a lawsuit was filed, or that the OCRC conducted an investigation and made a determination, *specific* facts and allegations in another lawsuit or OCRC investigation do not fall within Rule 201's definition of "a fact that is not subject to reasonable dispute." *See Kovacs v. University of Toledo*, 2023 WL 6518077, at *1 (N.D. Ohio) (citing *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 498, 498 n.7 (6th Cir. 2023)). "Judicial notice is not a 'work around' to admit otherwise inadmissible facts by the happy accident of their inclusion in a public record." *Id.*; *Changizi*, 82 F.4th at 498 n.7 ("While we could conceivably take judicial notice of the fact that an analogous case is ongoing in another circuit, Plaintiffs ask us to take judicial notice of the truth of assertions detailed in various judicial filings.").

This Court agrees. Although the Court may take judicial notice of the fact that other lawsuits were filed, and that the OCRC conducted an investigation and made a determination, it may not take judicial notice of *specific* facts, allegations, or conclusions within those other lawsuits or OCRC investigations because such facts do not fall within Rule 201's definitions.[9] In

---

9. Plaintiff asserts that this case differs in procedural posture from *Kovacs* in that the court there ruled on the motion for judicial notice before the summary judgment briefing concluded and after the court conducted a hearing on the motion; the court further granted Plaintiff leave to amend her opposition brief following its ruling. (Doc. 76, at 1; *see also* Doc. 76, at 2 ("Denying Plaintiff's Motion for Judicial Notice in this proceeding without a hearing and without granting the Plaintiff leave to amend her Brief in Opposition to the Defendant's Motion for Summary Judgment would unnecessarily and significantly prejudice the Plaintiff."). The Court disagrees that Plaintiff will suffer any undue prejudice. It is Plaintiff's burden, in opposing a well-supported summary judgment motion, to set forth admissible evidence that creates a genuine issue of material fact. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Indeed,

her opposition brief, Plaintiff seeks to rely not on the fact that a suit was filed or that an investigation was conducted, but the facts and conclusions set forth therein. This is not a proper use of judicial notice, and the Court denies Plaintiff's motion to take judicial notice thereof.

### Defendant's Motion to Strike OCRC Letters of Determination and Portions of Plaintiff's Opposition (Doc. 67)

Separately but relatedly, Defendant filed a Motion to Strike OCRC Letters of Determination and the sections of Plaintiff's Opposition brief relying thereon. (Doc. 67). Plaintiff opposed (Doc. 70) and Defendant replied (Doc. 72). This motion relates to Plaintiff's attempt to rely upon the OCRC determination letters for herself and LaShawna Jordan.[10] Defendant contends neither letter of determination should be considered because they have little, if any, probative value to the issues in this case. In opposition, Plaintiff argues that OCRC letters are public records of which a court can take judicial notice, and that the letters (from Plaintiff and Jordan, *as well as* Davis, Kovacs, and Chapman), are relevant and admissible under exceptions to the hearsay rules. (The citation of Davis, Kovac, and Chapman's OCRC determinations suggests Plaintiff is presenting a new argument – other than judicial notice – as to why these individuals' OCRC determinations are also appropriate for consideration). Each of the OCRC letters of determination Plaintiff relies upon contains a finding of "probable cause" for discrimination against an employee of Defendant's Human Resources Department based on actions between 2020 and 2021.  The parties dispute the relevance of the OCRC determinations and whether Defendants have shown the letters indicate a lack of trustworthiness.

---

as Plaintiff herself argues in response to a different motion that the appropriate response to inadmissible evidence in a brief is for the court to disregard such evidence. *See* Doc. 69, at 1. That Plaintiff responded, in part, with arguably inadmissible, irrelevant, or untrustworthy evidence does not entitle her to a second bite at the opposition brief apple.

10. Plaintiff again objects to Defendant's use of the term "strike" as noted above. (Doc. 70, at 1-2). As with the previous motion, the Court will construe Defendant's motion as an objection under Federal Civil Rule 56(c)(2).

<u>Plaintiff's OCRC Letter</u>

Plaintiff is correct that Federal Evidence Rule 803(8) provides that the hearsay rule does not exclude:

> **(8) *Public Records.*** A record or statement of a public office if:
> > **(A)** it sets out:
> > > **(i)** the office's activities;
> > > **(ii)** a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> > > **(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> > **(B)** the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). And this rule has been applied to OCRC administrative findings. *Alexander v. CareSource*, 576 F.3d 551, 563 (6th Cir. 2009); *see also Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo.").

However, citing the rule, *Alexander* also explained that such prior administrative findings may be excluded where there is an indication of a lack of trustworthiness. *Id.* In *Alexander*, the Sixth Circuit affirmed a district court's determination that "the letter was entitled to little weight [because] . . . the conclusions were not tied to specific facts, and it was unclear what evidence the investigator considered in reaching her conclusion." *Id.* And the *Anderson* court further emphasized there was no hearing before the agency. *Id.* It therefore found no error the district court's failing to assign any weight to an OCRC letter of determination.

Defendant emphasizes that similar factors exist here as to Plaintiff's OCRC letter of determination. Although Plaintiff submits the underlying OCRC files, the letter itself does not make clear what documents and information were relied upon to form its conclusions, it includes repeated statements such as "information shows" or "witness information reveals" without tying

those statements to specific evidence, and it does not state a hearing was held or actual "testimony" was taken. (Doc. 72, at 5); *see* Doc. 60-1, at 7-12.[11] The Court agrees with Defendant that the letters therefore indicate a lack of trustworthiness. Further, as to the letter's legal conclusion, courts have found that "[a] probable cause determination letter by an administrative agency has little, if any, probative value. The OCRC's determination that Meeker had probable cause to bring a Title VII sex discrimination claim does not prove a *prima facie* case exists on summary judgment." *Meeker v. Vitt*, 2006 WL 8450990, at *4 (N.D. Ohio); *see also Muir v. Chrysler LLC*, 563 F. Supp. 2d 783, 788 (N.D. Ohio 2008) ("The factual record before the Court controls its adjudication of the merits, not the conclusory finding contained in the EEOC letter. Furthermore, the Sixth Circuit has found such letters to hold limited probative value.").

As such, the Court determines it will exclude from consideration at this stage Plaintiff's OCRC letter of determination.

<u>OCRC Determinations as to Others</u>

In her summary judgment opposition brief, Plaintiff seemingly seeks to use the OCRC letters of determination as to others (both Jordan's and the letters of which she previously requested the court take judicial notice) to establish there was a pattern or practice of racial

---

11. Moreover, the summary of the evidence set forth therein appears to reflect similar evidence to that which has been submitted to this Court. The *Alexander* court also stated:

> It appears, however, the district court considered at least all of the same evidence examined by the OCRC team leader and arrived at its own conclusion. Because the lower court considered the same facts as the agency, the differing *conclusion* in the agency report does not by itself establish a material issue of fact, and there is no error by the district court in not assigning evidentiary weight to that conclusion.

576 F.3d at 563.

20

discrimination in Defendant's Human Resources Department in late 2020 and early 2021. *See* Doc. 61, at 6-8, 21-23; *see also* Doc. 64, at 1. Each OCRC letter contains a finding of probable cause as to discrimination. (Doc. 59-1, at 19-22); (Doc. 59-2, at 12-16); (Doc. 61-1). Thus, at its core, Plaintiff seeks to use the OCRC letters of determination in other cases for the facts and conclusions asserted therein, and the ultimate finding that there was "probable cause" that Defendant discriminated against others based on race. Defendant contends these letters are both irrelevant to the facts at issue in this case and suffer from the same lack of trustworthiness issues as Plaintiff's OCRC letter does.

Plaintiff does not cite a single case where a court considered an OCRC letter of determination related to someone other than the plaintiff herself. And as noted, "[a] probable cause determination letter by an administrative agency has little, if any, probative value." *Meeker*, 2006 WL 8450990, at *4. At core, Plaintiff seeks to rely on the OCRC's "probable cause" findings as proof that discrimination against others occurred and the facts summarized in the letter as evidence of that discrimination. "[T]he OCRC's *legal conclusion* that the evidence of racial discrimination against [another employee] met its probable cause standard is irrelevant here. Standing alone, the fact that the OCRC determined that there was probable cause to believe that [Defendant] discriminated against [another employee] does not bear on the question of whether Defendant wrongfully terminated Plaintiff." *Kovacs*, 2023 WL 6518077, at *2 ("I conclude that the OCRC's probable cause conclusion in another case, regarding another employee, and relying on different facts is even further removed from the realm of relevance and carries no probative weight here. I will not consider it at this stage in the litigation."). If a

probable cause determination in Plaintiff's own case is entitled to little if no weight, the same is true as to probable cause determinations in other cases.[12]

Finally, just as with Plaintiff's OCRC determination, the Court finds that none of the OCRC letters of determination upon which Plaintiff seeks to rely indicate they were issued following a hearing and they all fail to connect specific facts with specific evidence or testimony. For all of these reasons, the Court will exclude such letters of determination from its analysis.

Motion for Summary Judgment

The Court now turns to the underlying motion. Defendant contends Plaintiff cannot establish a *prima facie* case of race or gender discrimination, and that even if she could, it has offered a legitimate, non-discriminatory reason which Plaintiff cannot establish is pretext for

---

12. Furthermore, to the extent Plaintiff seeks to rely on the factual statements within the letters, there are hearsay-within-hearsay problems, as another Judge pointed out:

> [T]here are multiple layers of statements involved here, and each statement must conform with an exception to the hearsay rule. Fed. R. Evid. 805. The investigator summaries are statements by the investigator recounting and summarizing the out-of-court statements by the witness-declarants. In other words, it is the investigator saying what another witness said. It is the lat[t]er that is the problem here.

> Presumably, Plaintiff intends to use the witness interview summaries for their truth, that the relevant "asserted matters" are what the witnesses told the OCRC investigator. Thus, the ultimate declarant here is not the investigator but rather the witnesses. And no exception to the hearsay rule covers these statements of the co-worker witnesses.

*Kovacs*, 2023 WL 6518077, at *3. This is precisely the same thing Plaintiff seeks to do in the instant case. *See, e.g.*, Doc. 61, at 7 ("Later in November 2020, Elliott promoted a white employee, Elizabeth Wiley, overlooking a black employee, LaShawna Jordan, for that promotion."); *id.* at 23 ("When a white HR employee, Theresa Kovacs, pointed out potential problems with Equal Opportunity compliance in the fall of 2020, she was demoted and then fired, resulting in another probable cause finding against the University.").

discrimination. Plaintiff disputes each point. For the reasons discussed below, the Court finds Defendant entitled to summary judgment.

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Plaintiff asserts she was discriminated against based on her race and gender. *See* Doc. 33. An individual can prove a discrimination claim by either direct or indirect evidence. She need not do both. Here, Plaintiff argues she can prove her case in either way.

*Direct Evidence*

Plaintiff argues she has direct evidence of discrimination in the form of text messages from Ziviski sent seven weeks before the offer recission which she contends demonstrate animus toward African American individuals. As set forth above, these messages said:

| | |
|---|---|
| Powell: | Make sure Dre doesn't put in an email that this is Toth's fault, like he did with Newton . . . or maybe you want him to . . . [] |
| Ziviski: | [] I won't tell him not too [sic] if you don't. That's not true…I will try to help him. |
| Powell: | Just remember he plays dirty. |
| Ziviski: | They all do. |
| Powell: | Truth. |
| Ziviski: | I expect to be sued in the New Year. It's going to be one of my resolutions. |
| Powell: | Lol. I'll be a character witness for you. [] |
| Ziviski: | Thanks. I might need you to! |
| Powell: | You might! |

| Ziviski: | I will also practice my innocent look. |
| Powell: | Lol… |
| Ziviski: | WD and I can have our depositions on the same day. Maybe we can hang out together. |
| Powell: | Lol. Besties!! |

(Ex. 9, Powell Depo., Doc. 53, at 159-60).

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences" to be drawn. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). "In other words, direct evidence is 'smoking gun' evidence that 'explains itself.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir 2021) (quoting *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" *Id.* "'Whatever the strength of the evidence, it is not "direct" evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact.'" *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001)). If an inference is required to draw from the evidence the conclusion that an employer harbored animosity against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio

2006). And "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896–97 (6th Cir. 2003). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899.

Plaintiff argues: "It is undisputed that approximately seven weeks before Ziviski recommended the rescission of Harper's job offer . . . Ziviski texted her white friend that Wynn (and perhaps all African Americans) 'play dirty' and immediately thereafter joked about being sued for employment discrimination." (Doc. 61, at 18). First, as Defendant correctly points out, the "plays dirty" text message came from Powell, not Ziviski. Second, regardless, the Court agrees with Defendants that the messages cited (1) do not address Plaintiff's hiring in any way, and (2) are susceptible to various interpretations and therefore do not constitute direct evidence of discrimination. *See Kocak*, 400 F.3d at 470 (not direct evidence if it "admits more than one plausible interpretation"); *Zivkovic*, 450 F. Supp. 2d at 825 (if an inference is required to reach conclusion that comment refers to a protected class or the plaintiff's membership in a protected class, the evidence is not direct). Even assuming no inference is required to reach the conclusion that Ziviski intended to refer to African Americans when she texted "[t]hey all do" in response to

25

"Just remember he plays dirty" message, the text messages do not refer to Plaintiff in any way, and thus a further inference would be required to "establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein*, 232 F.3d at 488. As such, the Court finds Plaintiff has not presented direct evidence of discrimination.

*Indirect Evidence*

When a plaintiff does not put forth direct evidence of discrimination, this Court applies the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This framework places the initial burden on Plaintiff to establish her prima facie case. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). To satisfy this burden, the plaintiff must show "(1) [she] was a member of a protected class; (2) [she] suffered an adverse employment action; (3) [she] was qualified for the position; and (4) [she] was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (internal citations and quotations omitted). If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant articulates such a reason, the burden shifts back to the plaintiff to demonstrate the proffered reason was a mere pretext for discrimination. *Id.* at 253.

*Prima Facie Case*

Defendants contend Plaintiff cannot establish a *prima facie* case because she cannot show she (1) was qualified for the position; (2) suffered an adverse action; or (3) was replaced by or treated less favorably than someone outside the protected class.

*Qualification*

Defendants contend Plaintiff has not demonstrated she was qualified for the position, relying upon (1) Plaintiff's failure to complete certain pre-employment requirements; and (2) Plaintiff's misrepresentation of her qualifications.

To assess the qualification prong of the *prima facie* test, a Court focuses on the plaintiff's "objective qualifications". *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. The objective qualifications for a position may be found in the job description. *See Alexander v. CareSource*, 576 F.3d 551, 563-64 (6th Cir. 2009) ("[Defendant]'s job description amounts to evidence of the minimum job qualifications"). A court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. *Id.* at 574 (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000)).

<u>Completion of Onboarding Requirements</u>

The Court finds unpersuasive Defendant's argument that Plaintiff was not qualified for the position because she did not timely complete the onboarding requirements, including specifically a background check. First, Plaintiff's offer was withdrawn five days prior to her start

date, and she has cited evidence that other employees' background checks had been completed in less than 24 hours, and one as quickly as ten minutes. *See* Fahey Depo., at 24-28. Second, although Defendant argues that "failure to complete a pre-employment requirement, upon which the offer of employment is conditioned, such as completing or passing a background check is relevant to whether the plaintiff is qualified for the role", the cases it cites involve only circumstances where an individual failed or was unable to pass a background check. *See Strong v. Orkand Corp.*, 83 F. App'x 751, 753 (6th Cir. 2003) ("The condition of a favorable security clearance is a requirement of the United States Postal Service. The denial of Strong's security clearance rendered him unqualified for the job."); *Crespo v. Harvard Cleanings Servs.*, 2014 WL 5801606, at *6 (S.D.N.Y.) ("The passage of a background check is a potentially legitimate qualification . . . Crespo failed the background check . . . Crespo therefore lacked the necessary qualifications for working in a permanent position at 270 Park Avenue."); *Johnson v. Pub. Servs. Enter. Grp.*, 529 F. App'x 188, 193 (3d Cir. 2013) ("The employment offer with PSE & G was contingent upon a satisfactory background check, and when Johnson did not pass, the conditional offer was rescinded."). This is not the same as the failure to undergo the process of a background check. Thus, although the Court agrees that passage of a background check may be a qualification of the job, the evidence does not demonstrate Plaintiff lacked such a qualification. Nor has Defendant cited caselaw to support its argument that failure to complete other onboarding requirements demonstrates a candidate is "unqualified".

<u>Misrepresentations</u>

Next, Defendant argues Plaintiff was unqualified because she made misrepresentations in her application. The Court agrees wholeheartedly with the proposition that "basic honesty is an objective qualification for any legitimate position of employment", *Serrano v. Cintas Corp.,*

2008 WL 4539339, at *12 (E.D. Mich.), and that Plaintiff demonstrated a lack of such a qualification. On her resume (upon which she expected Defendant to rely (Plaintiff Depo., at 63, 87)), Plaintiff represented that she had worked as a "Legal Researcher / Litigation Associate" from 2001 to 2007, and in this job "[s]erved as 1st and 2nd chair with head counsel in court proceedings." (Plaintiff Depo., Ex. 1, Doc. 52, at 180). She further represented she had worked as "General Counsel". *See id.* at 178 ("Results-driven general counsel with more than four decades of *corporate legal*, teaching, nonprofit leadership, and grant writing experience.") (emphasis added). These statements clearly represent that Plaintiff was a licensed attorney. And her February 2023 sworn deposition testimony continued this misrepresentation that Plaintiff was a licensed attorney:

> Q:    And did you pass the Bar exam in Michigan?
>
> A:    Yes.
>
> Q:    Do you recall what year?
>
> A:    No.
>
> Q:    Did you obtain a license to practice law in Michigan?
>
> A:    Yes.
>
> Q:    Do you know what year?
>
> A:    No.
>
> Q:    Is your license to practice law still active?
>
> A:    No.
>
> Q:    Do you know when it was no longer active?
>
> A:    No.
>
> Q:    Has your law license been active within the past ten years?

29

A:      No.

Q:      Do you know how long your law license was active?

A:      No.

Q:      Do you recall why your law license is no longer active?

A:      Because I didn't make it activated anywhere else.

Q:      Why is that?

A:      I wasn't interested in practicing law, per se.

Q:      Why were you no longer interested in practicing law?

A:      I just wasn't.

Q:      Sitting here today, you don't recall what year you stopped practicing law?

A:      No.

*  *  *

Q:      . . . [O]n the last page of your resume, it indicates you also worked at the law offices of Baker and Selby; correct?

A:      Yes.

*  *  *

Q:      And did you work there as an attorney?

        Ms. Kramer:   Objection.

[A]:    Legal researcher and litigation associate as the title says.

Q:      Did you work with Baker and Selby as an attorney?

        Ms. Kramer:    Objection. She just answered that exact question.

[A]:    I said I worked as a legal researcher and litigation associate.

Q:      In the capacity as an attorney or some other capacity?

A:     As it says, I interpreted, analyzed, applied law for preparing legal pleadings for court procedures. I investigated, researched, and summarized pretrial findings for the Court, and I served as a first and second chair when we had court proceedings.

Q:     In the course of your work with Baker and Selby, were you working there as a licensed attorney?

       Ms. Kramer: Objection.

[A]:   I worked as a legal researcher and litigation associate.

Q:     Not as a licensed attorney?

A:     As a legal researcher and litigation associate.

Q:     Is there a difference between a licensed attorney and a legal researcher/litigation associate?

A:     I think, by definition of what I did, that doesn't say I represented people as lead counsel in court proceedings.

Q:     So I'm confused. Did you have a license to practice law during the time that you worked at Baker and Selby?

A:     Yes.

Q:     And was your license to practice law active during the time you worked at Baker and Selby.

A:     I thought it was.

Q:     And that's also what you had expressed to the University of Toledo in this resume that you submitted to the university as part of your application; correct?

A:     I don't understand the question.

Q:     This resume that you sent to the University of Toledo as a part of your application to the university, and part of what you summarized was your experience at Baker and Selby; right.

A:     Yes.

(Plaintiff Depo., at 24-25; 85-87). Despite Plaintiff's attempts to seemingly dance around some of these questions, she expressly stated she was a licensed attorney. As someone who attended law school, Plaintiff should know that "litigation associate" and "general counsel" are terms used to describe a practicing attorney. Plaintiff further admitted in her deposition that – contrary to her resume's representation – she never worked as general counsel for any company. *Id.* at 91. On top of this, in her opposition brief, Plaintiff states for the first time that she "did attend and graduate from law school but did not pass the one bar exam she took." (Doc. 61, at 17). The only citation she provides for this proposition is Dreyon Wynn's affidavit, in which he states: "at the time the University offered Harper the SLRS job, I was aware that, although Harper had attended and graduated from law school, she was not admitted to practice law." (Wynn Aff., Doc. 60-2, at ¶ 7). Thus, without expressly addressing her previous contrary testimony, Plaintiff seemingly admits that said testimony was untrue.

The Court finds it could end the analysis here. Plaintiff's misrepresentations to Defendant in her application (and shockingly continued in her February 2023 deposition testimony in this case) are sufficiently egregious to warrant a determination that she was not qualified for the job for which she applied because she does not meet the qualification of "objective honesty" and has not established a question of fact regarding the second prong of a *prima facie* case of discrimination.

Nevertheless, in the interest of thoroughness and in the alternative, the Court will proceed through the remaining steps of the analysis because (1) Defendant has not argued or established that the Senior Labor Relations Specialist position is a legal job requiring one to be a practicing

attorney[13], and (2) Plaintiff has submitted evidence that Defendant (or at least Wynn, who was on the search committee) was potentially aware of some discrepancy between Plaintiff's application materials and her objective qualifications at the time she was hired. *See* Wynn Aff., Doc. 60-2 at ¶ 7. And Elliott testified repeatedly that Plaintiff was qualified for the position. (Elliott Depo., at 16, 19, 117). The Court does note that Wynn's Affidavit is not entirely clear and seemingly only speaks to whether Plaintiff was "admitted to practice law" at the time Defendant offered her the job, not whether she had *ever* been licensed as an attorney, which her opposition brief appears to admit – contrary to her prior testimony – that she *was not*. *See* Wynn Aff., Doc. 60-2, at ¶ 7; Doc. 61, at 17.

*Adverse Action*

Next, Defendant contends Plaintiff cannot show she suffered an adverse employment action because it merely withdrew a contingent offer of employment that Plaintiff never actually accepted.

In the context of Title VII discrimination claims, "[a]n adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Defendant relies on *Strong v. Orkand Corporation* to argue that its action was based on Plaintiff's own inaction (failing to complete her onboarding requirements and lack of communication) and therefore its "decision to rescind the offer constitutes a neutral action rather

---

13. The position description states that a Bachelor's Degree in Public Administration, Human Resources, or [a] closely related field" is "required" and that a "JD" is "preferred." (Ex. 15, Elliott Depo., Doc. 54 , at 192).

33

than an adverse one". (Doc. 65, at 13) (citing *Strong v. Orkand Corp.*, 83 F. App'x 751, 754 (6th Cir. 2003)). In *Strong*, the plaintiff was hired "contingent upon his ability to obtain a background security clearance from the Postal Inspection Service and was specifically advised that without a favorable background check this offer of employment would be withdrawn." *Id.* at 753. When the plaintiff failed to pass that background check, he was terminated. *Id.* The Sixth Circuit explained:

> The failure to offer permanent employment constitutes only neutral action on the part of the defendant. *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 273–74 (7th Cir.1996). Strong was required to obtain a favorable security clearance as a condition of employment. He was denied the security clearance and was unsuccessful in appealing that denial. Strong was terminated for his failure to meet a required condition for employment as a Technical Information Specialist.

*Id.* Thus, in *Strong*, it appears the plaintiff was hired on a temporary basis and denied permanent employment for failure to meet the favorable background check requirement. That is not what happened here.

Plaintiff contends that the January 21, 2021, recission "meets the definition of adverse, as it is a significant change in employment status." (Doc. 61, at 19). She emphasizes that she verbally accepted the job offer in December 2020. Defendant again cites that Plaintiff never completed the pre-hiring requirements.

The Court finds Plaintiff has established at least an issue of fact regarding whether she suffered an adverse employment action by virtue of Defendant's recission. Plaintiff testified (Fahey Depo., at 24), and Fahey confirmed (Plaintiff Aff., at ¶ 6), that Plaintiff verbally accepted the job offer on the phone in December 2020. The withdrawal of that offer qualifies as an adverse employment action.

*Replacement / Less Favorable Treatment*

In its final argument directed at Plaintiff's ability to establish a *prima facie* case, Defendant argues Plaintiff cannot establish she was replaced by, or treated less favorably than, someone outside her protected class. Plaintiff does not directly address this argument in her opposition brief. *See* Doc. 61, at 18-19 (addressing second and third but not fourth prong of a prima facie case). However, in her statement of facts, Plaintiff appears to argue that Powell replaced her, and that Elliott was similarly situated and treated more favorably. *See* Doc. 61, at 9,12-13). The Court addresses each argument in turn.

<u>Elliott</u>

Plaintiff points to Elliott as someone outside the protected class who was treated more favorably than her. Specifically, she cites Fahey's testimony that Elliott was permitted to start his job before completing his medical screening and his Medicare Fraud and Abuse verifications. (Doc. 61, at 9) ("In other words, the University permitted Elliott to start working there prior to the completion of all of his onboarding documents and did not rescind his job offer because he failed to complete everything on time."); (Fahey Depo., at 30-32). She further cites Fahey's testimony that Plaintiff could have started her job prior to the completion of her medical screening. (Fahey Depo., at 32-33). Defendant responds that Elliott is not similarly situated to Plaintiff for two reasons: (1) Elliott was a supervisory employee and Plaintiff was not; and (2) even absent the supervisory distinction, Plaintiff has not demonstrated Elliott failed to complete as many onboarding documents as she had.

The Sixth Circuit has "held supervisory and non-supervisory employees to not be similarly situated". *Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 672 (6th Cir. 2011) (citing *See Quinn–Hunt v. Bennett Enters., Inc.,* 211 F. App'x 452, 459 (6th Cir. 2006) ("Stickley is a

supervisory employee, and Quinn–Hunt is not . . . This weighs against a finding that they are similarly situated."); *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir. 1994) (holding that a supervisor was not similarly situated to a non-supervisor). Moreover, employees with different job responsibilities may not be similarly situated. *Russell v. Ohio Dep't of Admin. Servs.,* 302 F. App'x 386, 391 (6th Cir. 2008) (finding employees not to be similarly situated in part because they had different job duties); *Campbell v. Hamilton Cnty,* 23 F. App'x 318, 325 (6th Cir. 2001) ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.") (citations omitted).

The Court agrees with Defendant that Plaintiff has not established Elliott is similarly situated. In addition to the supervisory position/non-supervisory position distinction, the Court finds that the sheer number of onboarding documents not completed five days prior to Plaintiff's start date materially distinguishes her situation from Elliott's.[14]

<u>Powell</u>

Plaintiff also appears to argue that she was replaced by Powell. *See* Doc. 61, at 12 ("The position which the University offered to Powell on January 26, 2021, was almost identical to the position which the University had withdrawn from the Plaintiff on January 20, 2021."). Defendant contends Plaintiff cannot establish Powell replaced her because (1) he was hired for a different position and (2) Powell ultimately never started working for Defendant.

In the Sixth Circuit, a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when

---

14. To the extent Plaintiff argues she was treated less favorably than Bungard, who requested and received a delayed start date (*see* Doc. 61, at 16), the Court finds the request itself makes Bungard not similarly situated. Plaintiff did not communicate any request for a delayed start date.

another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

First, although the positions offered to Plaintiff and Powell were similar, they were not identical. The Senior Labor and Employee Relations and Compliance Specialist position offered to Powell included the following duties not included in the Senior Labor Relations Specialist position offered to Plaintiff:

> Evaluates and consolidates information from various sources, such as equal opportunity reporting, Ohio Civil Rights Commission, Ohio Revised Code, Ohio Administrative Code, open/closed investigations and documenting necessary information to ensure institutional compliance.
>
> Assists in drafting internal memos for harassment investigations and Title VII.
>
> Assists with unemployment paperwork and hearings.
>
> Assists with projects requiring research and preparation of presentation materials.
>
> Assists in maintaining the compliance complaint log.
>
> Responds to public records requests.

(Ex. 16, Doc. 54, at 195-96). The job posting indicates these duties are twenty percent of the job. *Id.* at 195. Additionally, the position offered to Powell stated that it "directly supports the Office of Legal Affairs in matters related to public record requests and other documentations needed for legal proceedings. The position will also take work direction from the Director of Equal Opportunity, Affirmative Action, and HR Compliance with regard to Title VII investigations. *Id.* at 197. Second, it is undisputed that Powell never actually went to work for Defendant and the Senior Labor Relations Specialist position for which Plaintiff applied was not reposted and was never filled. As such, the Court finds Plaintiff has not established a question of fact regarding whether she was replaced by someone outside the protected class. Moreover, even assuming

*arguendo* Plaintiff could establish a *prima facie* case, the Court finds below she cannot establish pretext.

*Legitimate Non-Discriminatory Reason*

Defendant further contends that even if Plaintiff could establish a *prima facie* case, it has identified a legitimate non-discriminatory reason for withdrawing Plaintiff's employment offer: her failure to complete the required pre-employment paperwork in a timely manner and her lack of communication.

An employer's burden is one of production, not of persuasion; it need only state a reason, not prove one. *Burdine*, 450 U.S. at 254–55; *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment," (citation omitted)). Defendant has satisfied this limited burden of production. "When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).

*Pretext*

Defendant contends Plaintiff has not presented any evidence that its proffered reason for rescinding the employment offer was pretext for discrimination. Plaintiff argues in response that she can show pretext by: (1) the fact that Powell was preselected; (2) Defendant engaged in a pattern of race discrimination at the time Plaintiff's offer was withdrawn, (3) Elliott was permitted to start without completing all of his paperwork; and (4) it was Defendant's own action which prevented Plaintiff from electronically signing her offer letter.

The "ultimate inquiry" is this: "did [Defendant act] for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580

F.3d 394, 400 n.4 (6th Cir. 2009)). To answer that question and establish pretext, plaintiffs typically establish one of three things: (1) that the employer's proffered reason "had no basis in fact," (2) that the proffered reason "did not actually motivate the employer's action," or (3) that the proffered reason was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle*, 692 F.3d at 530 (quoting *Chen*, 580 F.3d at 400). So plaintiffs remain free to pursue arguments outside these three categories. Even so, a plaintiff must articulate some cognizable explanation of how the evidence she has put forth establishes pretext. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Ultimately, a plaintiff must produce "sufficient evidence from which a jury could reasonably reject" Defendant's proffered reason for its actions. *Id.* (quoting *Chen*, 580 F.3d at 400).

First, the Court finds that Powell's purported preselection for the Senior Labor and Employee Relations and Compliance Specialist position does not establish pretext because as discussed above, this is not the same position Plaintiff was offered (and Plaintiff did not apply for this position). Nor does any irregularity in his hiring process show pretext. *See Bertram v. Medina Cnty.*, 2008 WL 1696490, at *5 n.11 (N.D. Ohio) (citing *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)).

Second, for the same reasons set forth above regarding similarly situated employees, the Court finds Plaintiff's argument that Elliott was permitted to start without completing all pre-employment documentation does not establish pretext.

Third, Plaintiff alleges in support of her pretext argument that Defendant's Human Resources Department was "engaged in a pattern of race discrimination at the time the Plaintiff's job was rescinded." (Doc. 61, at 21). "Evidence that an employer engaged in a pattern or practice of discrimination may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework." *Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 399 (6th Cir. 2013); *see also Williams v. Dearborn Motors I LLC*, 2021 WL 3854805, *6 (6th Cir.) "[A] plaintiff may use pattern evidence of disparate treatment . . . although, standing alone, it is insufficient evidence to withstand summary judgment.") (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007)). As set forth above, the Court has found that judicial notice of the substance of the Complaints and OCRC letters of determination in unrelated cases is not appropriate and Plaintiff cannot rely on the substance of those letters to prove others were discriminated against. As such, even if such pattern or practice evidence were an appropriate way to prove pretext at this juncture, Plaintiff has not submitted sufficient evidence thereof. Moreover, even if the Court were to consider that the OCRC issued probable cause determinations in the other cases cited, it would not find that fact, "standing alone" sufficient to establish a question of fact regarding whether the withdrawal of the offer in Plaintiff's individual case was pretext for discrimination. *Williams*, 2021 WL 3854805, *6 ("[A] plaintiff may use pattern evidence of disparate treatment . . . although, standing alone, it is insufficient evidence to withstand summary judgment.") (quoting *Nichols*, 510 F.3d at 782).

Fourth, the Court finds Plaintiff has not established a factual question as to whether Defendant prevented her from completing the onboarding requirements. That is, Plaintiff has not created a factual question regarding whether Defendant's reason for withdrawing the offer – Plaintiff's failure to complete onboarding requirements and lack of communication – was pretext

for discrimination. Although Plaintiff now cites her Affidavit in which she states she does not recall receiving emails which would have permitted her to electronically sign her offer letter or start her background check (Plaintiff Aff., Doc. 60-2, at ¶ 10), Plaintiff's deposition testimony and other evidence make clear that Plaintiff was aware of onboarding requirements, *see* Ex. 3 to Plaintiff's Motion to Amend Complaint, Doc. 32-4 (December 14, 2020 written offer stating: "To accept this conditional offer of employment, please electronically sign this letter.")[15]; Ex. 14, Plaintiff Depo., Doc. 52, at 275 (December 17, 2020 email from Plaintiff to Fahey stating "I am in receipt of several emails from your office regarding Onboarding for the Senior Labor Relations Specialist position[.]"); Ex. 15, Plaintiff Depo., Doc. 52, at 280 (documents sent back to Defendant by Plaintiff which state: "Please electronically complete the seven forms attached and email them back . . ." and contain additional instructions regarding college transcripts). Regardless of Plaintiff's newfound assertion that she did not receive certain emails, it is undisputed that Plaintiff knew onboarding requirements were a condition of her employment and she had not completed them five days prior to her start date. Taking these with Plaintiff's lack of communication (the other nondiscriminatory reason Defendant relies upon), the Court finds Plaintiff has not created a question of fact regarding whether Defendant's rationale was not based in fact or did not motivate Defendant's action.

---

15. Plaintiff's testimony from her deposition on this point is as follows:

> Q:     Back to right above John Elliott's signature, to accept this conditional offer of employment, please electronically sign this letter; right?
>
> A:     Yes.
>
> Q:     You never electronically signed this letter, did you?
>
> A:     No.

(Plaintiff Depo., at 113).

Finally, even if Plaintiff could establish that the proffered reason (the onboarding paperwork and lack of communication) "did not actually motivate the employer's action", *Chen*, 580 F.3d at 400, but rather Ziviski was motivated by her desire to hire her friend and former coworker Powell, the Court agrees with Defendant that "[t]here is simply no evidence to suggest that race or gender played any role." (Doc. 65, at 15). That is, Plaintiff argues Defendant was motivated by Ziviski's desire to hire Powell, not by her incomplete onboarding requirements. But to the extent she can prove this, though it could arguably show the reason for withdrawing Plaintiff's offer was pretextual, it does not show pretext *for prohibited discrimination*. A plaintiff must ultimately prove both that her employer's stated reason for taking action "was not the real reason for its action, *and* that the employer's real reason" was discrimination. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc). At summary judgment, a plaintiff generally need only produce evidence that would allow a jury to find that her employer's stated reason "is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (quotation omitted). Nevertheless, the Supreme Court and Sixth Circuit have explained:

> Certainly, there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment . . . if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision . . .

*Alberty v. Columbus Twp.*, 730 F. App'x 352, 359 (6th Cir. 2018) (quoting *Reeves*, 120 S. Ct. at 2109). An "employer's reason . . . does not have to be a *good* reason . . . for it to escape liability," but "must merely be based on grounds not proscribed by the statute". *Hoffman v. Professional Med Team,* 394 F.3d 414, 422 (6th Cir. 2005). And "charges of nepotism, even if proven, do not constitute evidence of impermissible discrimination under Title VII." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996); *see also id.* ("'The list of

impermissible considerations within the context of employment practice is both limited and specific . . . . We are not free to add our own considerations to the list.'") (quoting *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989)); *Quinn-Hunt v. Bennett Enterprises, Inc.*, 211 F. App'x 452, 458 (6th Cir. 2006) ("Additionally, with regard to the alleged favoritism toward Chris Helge, Mary Helge's sister, nepotism and favoritism are not evidence of impermissible discrimination."); *Clark v. Cache Valley Elec. Co.,* 573 F. App'x 693, 697–98 (10th Cir. 2014) (collecting cases for the proposition that decisions motivated by friendship, cronyism, or nepotism do not constitute actionable discrimination); *Barry v. Moran*, 661 F.3d 696, 708 (1st Cir.2011) ("employment decision motivated by cronyism, not discrimination, would be 'lawful, though perhaps unsavory'").

The Court finds Plaintiff has not established a genuine issue of material fact regarding pretext for discrimination, and Defendant is therefore entitled to summary judgment.

### CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Judicial Notice (Doc. 59) be, and the same hereby is, DENIED, and it is

FURTHER ORDERED that Defendant's Motion to Strike Portions of the Affidavit of Dreyon Wynn (Doc. 66), construed as an objection under Federal Civil Rule 56(c) be, and the same hereby is, SUSTAINED; and it is

FURTHER ORDERED that Defendant's Motion to Strike Ohio Civil Rights Commission Letters of Determination and Sections of Plaintiff's Opposition Relying on Improper Evidence (Doc. 67), construed as an objection under Federal Civil Rule 56(c) be, and the same hereby is, SUSTAINED, and it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File Sur-Reply (Doc. 68) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. 58) be, and the same hereby is, GRANTED.


      _s/ James R. Knepp II_
UNITED STATES DISTRICT JUDGE